IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OKNA WINDOWS | : | CIVIL ACTION |
| v. | : | |
| DIVERSIFIED STRUCTURAL COMPOSITES | : | NO. 18-2444 |

**MEMORANDUM**

**Padova, J.**                                                                                                                 **August 8, 2019**

Plaintiff Okna Windows Corporation ("Okna") commenced this breach of contract action against Defendant Diversified Structural Composites ("Diversified") after Diversified stopped collaborating with Okna on a new line of fiberglass double-hung windows. Both parties have moved for summary judgment. For the following reasons, we deny Plaintiff's Motion, grant Defendant's Motion, and enter summary judgment in Defendant's favor.

**I. BACKGROUND**

The undisputed facts in the summary judgment record are as follows. Since 1994, Plaintiff Okna has manufactured windows and doors for commercial and residential clients. (Def.'s Ex. C ("September 27, 2014 Email").) Until 2014, Okna produced these windows and doors primarily using vinyl and composite components. (Id.) In the spring of 2014, Okna decided to enter into the fiberglass window market. (Id.; Pl.'s Mot., Ex. B ("Ostaniewicz Dep.") at 18:22-19:4.) After Okna decided to enter the market, it was introduced to Diversified. (Ostaniewicz Dep. at 23:9-17.) Until that time, Diversified predominantly sold pultruded components,[1] such as window components like lineals and profiles, but it had decided to branch

---

[1] The Oxford English Dictionary defines "pultrusion" as "[a] process for making reinforced plastic articles in which a bundle of glass fib[er]s is pulled through a resin bath and subsequently through a heated die to shape and cure the resin." Pultrusion, Oxford English

out into selling fenestration products, such as windows and doors. (Pl.'s Ex. A ("Klawonn Dep.") at 16:24-17:20.)

After being introduced, the parties discussed designing a new model of double-hung window that would use fiberglass components, and Okna visited Diversified's offices in July 2014. (Ex. 6 to Pl.'s Ex. A.) Around the same time, a representative from OmniGlass, another pultrusion supplier, notified Okna of a September 2014 auction in Chicago where industrial equipment used to manufacture windows would be for sale. (Def.'s Ex. H.) In advance of the auction, Okna signed a demolition contract to destroy part of its existing factory space. (Ex. 4 to Pl.'s Ex. B.) Troy Osborne, one of Diversified's engineers, travelled to the auction, "blessed" the equipment that Okna was considering, and said it "would be a good purchase." (Ostaniewicz Dep. at 70:11-14; Def.'s Ex. G at 3.) Okna then purchased the equipment. (Ostaniewicz Dep. at 70:15-71:4.)

After purchasing the equipment at the auction and demolishing 50,000 square feet for the fiberglass line, Okna sent an email to Diversified stating that it was committed to moving forward with a fiberglass program and that it would prefer to do business with Diversified Lineal Systems ("DLS").[2] (Ostaniewicz Dep. at 71:5-11; September 27, 2014 Email.) Okna explained that it had budgeted $500,000 towards equipment and tooling for the project and that it had already committed over $400,000 for the purchase and installation of the equipment bought at auction. (September 27, 2014 Email.) Okna therefore sought for Diversified to finance the pultrusion

---

Dictionary, https://oed.com/view/Entry/154443?redirectedFrom=Pultrusion#eid (last visited July 30, 2019).

[2] DLS is a tradename for Diversified's fenestration business (i.e., windows and doors). (Klawonn Dep. 18:4-6.) The products produced by Diversified's fenestration business were also branded as DLS materials, such as the Series 3500 Double-Hung Window. (Preamble to the MoA, Ex. 10 to Pl.'s Ex. A.)

2

tooling necessary to manufacture components needed for double-hung and casement window systems that were "under consideration." (Id.) Diversified responded that it considered Okna a key customer and asked for Okna to put its proposal on company letterhead. (Id.)

The parties eventually negotiated a two-page Memorandum of Agreement ("MoA"), which expressed the parties' desire to enter into a business relationship for the supply of DLS fenestration materials. (Ex. 10 to Pl.'s Ex. A.) The MoA, which the parties signed on January 14, 2015, provided that the parties would finalize the design of the Series 3500 double-hung, double slider, and picture windows by January 16, 2015. (Id. at 1.) Okna agreed to contribute $80,000 to Diversified for the costs of customized tooling to produce the Series 3500 double-hung window and to issue a purchase order for at least one million dollars of unspecified DLS products. (Id.) In return, Diversified agreed to "accelerate the purchase of all tooling, corner keys, supplementals, testing and certification for the 3500 Series." (Id.) The parties also agreed to execute non-disclosure agreements. (Id. at 2.) Crucially, the MoA contains in bold type a non-binding obligation ("NBO") clause, which provides that:

> **This Memorandum of Agreement does not constitute or create, and shall not be deemed to constitute or create, any legally binding or enforceable obligation on the part of either party. No such obligation shall be created, except by the execution of separate written agreements and purchase orders with associated terms and conditions.**

(Id.)

Okna contributed the $80,000 tooling costs through Polstar, a company related to Okna, and attached to the MoA a $1,000,000 signed purchase order (the "Purchase Order") for unspecified DLS materials. (Klawonn Dep. at 91:1-5; Ostaniewicz Dep. at 63:20-64:1.) The Purchase Order states that specific materials would be given in subsequent purchase orders. (Ex. 10 to Pl.'s Ex. A at 3.) There is no record evidence of the parties' executing non-disclosure agreements. (Ostaniewicz Dep. at 54:15-56:7; 60:13-61:15.) Diversified used the MoA and the

3

attached Purchase Order to procure $400,000 in funding from its Japanese parent for the re-tooling. (Klawonn Dep. at 45:17-22.)

The parties completed a prototype of the double-hung window on November 11, 2015. (Ostaniewicz Dep. 97:16-19.) Samples based on this model were submitted to the American Architectural Manufacturers Association ("AAMA"), and while the window received some AAMA certification, Okna was not happy with the results. (Id. at 62:15-18; 96:13-16.) Mike Clay, one of Diversified's employees, went to Okna's facilities and helped design and build other window specimens for testing. (Id. at 62:1-3; Klawonn Dep. at 101:8-12.) After developing the double-hung window, the parties discussed developing a casement window together and produced a draft agreement. (Exs. 12-13 to Pl.'s Ex. A; Ostaniewicz Dep. at 65:11-21.) This agreement, however, was not signed by either party, and Okna did not tender the $150,000 for tooling that the new casement window agreement would have required.[3] (Klawonn Dep. at 63:3-5; Ostaniewicz Dep. at 67:18-20; 68:3-11.)

Sometime in late 2015, Diversified's parent company gave Robert Klawonn, then-President of Diversified, a short period of time to prove definitively that Diversified's fenestration business was viable. (Klawonn Dep. at 76:22-77:7.) In early 2016, Diversified's parent company decided to withdraw from the Series 3500 project. (Id. at 77:7-9; 82:2-4.) Robert Klawonn informed Okna on March 11, 2016 that Diversified would be withdrawing from the project. (Id. at 85:25-86:6.) Diversified refunded Okna the $80,000 contribution that Okna had made toward retooling, and the parties unsuccessfully attempted to resolve their differences without resorting to litigation. (Klawonn Dep. at 90:23-25; Exs. 21-22 to Pl.'s Ex. A.)

---

[3] Okna concedes that the casement window agreement was not signed, and it does not assert any claim with respect to that agreement. (Pl.'s Resp. at 1.)

4

Okna filed this action on June 11, 2018. The Complaint asserts four claims for relief: breach of contract, breach of implied contract, breach of requirements contract, and promissory estoppel. Okna demands compensatory damages of $1,782,300, the costs of suit, incidental and consequential damages including attorney's fees for the breach of the requirements contract, and such other relief as the Court may deem appropriate. Okna moves for summary judgment as to the breach of contract and the breach of requirements contract claims; Diversified moves for summary judgment on all counts.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. In ruling on a summary judgment motion, we consider "the facts and draw all reasonable inferences in the light most favorable to . . . the party who oppose[s] summary judgment." Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007)). If a reasonable fact finder could find in the nonmovant's favor, summary judgment may not be granted. Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir. 2002) (citation omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof on a particular

issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a material fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'" Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)).

## III. DISCUSSION

### A. Count I: Breach of Express Contract

In Count I, Okna claims that Diversified breached the MoA by deciding not to proceed with the Series 3500 project to produce double-hung windows with fiberglass profiles. Okna argues that its submission of the Purchase Order made the MoA a binding contract that Diversified subsequently breached. Diversified argues, in contrast, that the plain language of the MoA states that it is non-binding and therefore the MoA cannot form the basis of Okna's breach of contract claim.

"It is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the

6

contract[, and] (3) resultant damages." Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016) (citing J.F. Walker Co. v. Excalibur Oil Grp., Inc., 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002)). "To establish the existence of an agreement one must show that: (1) both parties have manifested an intention to be bound by the terms of the agreement; (2) the terms of the agreement are sufficiently definite to be specifically enforced; and, (3) there is mutuality of consideration." Ecore Int'l, Inc. v. Downey, 343 F. Supp. 3d 459, 487 (E.D. Pa. 2018) (quoting Redick v. Kraft, Inc., 745 F. Supp. 296, 300 (E.D. Pa. 1990)); see also Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002) (citations omitted). "'The burden of proving the existence of a contract lies with the party relying on its existence.'" Teva Pharm. Indus., Ltd. v. UnitedHealthcare Servs., Inc., Civ. A. No. 16-4870, 2018 WL 1898911, at *11 (E.D. Pa. Apr. 20, 2018) (quoting Guzzi v. Morano, Civ. A. No. 10–1112, 2013 WL 4042511, at *10 (E.D. Pa. Aug. 8, 2013)).

"'Under Pennsylvania law where the facts are in dispute, the question of whether a contract was formed is for the jury to decide.'" Ecore Int'l, Inc., 343 F. Supp. 3d at 487 (quoting Quandry Sols. Inc. v. Verifone Inc., Civ. A. No. 07-97, 2009 WL 997041, at *5 (E.D. Pa. Apr. 13, 2009)). "'However, [t]he question of whether an undisputed set of facts establishes a contract is a matter of law.'" Id. (alteration in original) (quoting Quandry Sols. Inc., 2009 WL 997041, at *5). Here, the parties do not dispute the relevant facts; instead, they simply argue whether those facts give rise to an enforceable contract.

"The first element in the test for enforceability of a contract is whether both parties have manifested an intention to be bound." Teva Pharm. Indus., Ltd. v. United Healthcare Servs., Inc., Civ. A. No. 16-4870, 2018 WL 1898911, at *6 (E.D. Pa. Apr. 20, 2018) (citing Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 582 (3d Cir. 2009)). "The strongest objective

manifestation of intent is the language of the contract." Id. (citing Mellon Bank N.A. v. Aetna Bus. Credit, 619 F.2d 1001, 1009 (E.D. Pa. 1980)). "Pennsylvania contract law begins with the 'firmly settled' principle that the 'the intent of the parties to a written contract is contained in the writing itself.'" Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R., 870 F.3d 244, 253 (3d Cir. 2017) (quoting Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 92 (3d Cir. 2001)).

In the NBO provision of the MoA, the parties clearly state that the MoA does not give rise to any binding obligations unless separate written agreements and purchase orders are executed. (Ex. 10 to Pl.'s Ex. A at 2.) When parties express that a writing is not binding unless certain conditions are met, courts honor their intent not to be bound unless those conditions are met. See Fetter v. N. Am. Alcohols, Inc., Civ. A. No. 06-4088, 2008 WL 5187877, at *5 (E.D. Pa. Dec. 10, 2008) (finding "an intent *not* to be bound" in a letter that explicitly stated that it was only an outline of terms and conditions that would need to "be formalized in a contract"); CKSJB Holdings, LLC v. EPAM Sys., Inc., 379 F. Supp. 3d 388, 395-96 (E.D. Pa. 2019), appeal docketed No. 19-1951 (3d Cir. Apr. 25, 2019) (finding no obligation to negotiate in good faith where the Indication of Interest expressly stated that it did not give rise to any legally binding obligation). Here, the record contains no evidence of a separate written agreement as is required to make the MoA binding.[4] (Klawonn Dep. at 63:3-5.) Likewise, the record contains no evidence of a separate

---

[4] At oral argument, Okna claimed for the first time that the Purchase Order attached the MoA is both a separate purchase order and a separate written agreement. (Hr'g Tr. at 17:8-10.) It is possible for a purchase order to constitute an enforceable contract where the purchase order sets forth specific terms of an offer that the recipient accepts by performing and strictly adhering to the terms. See, e.g., Selas Fluid Processing Corp. v. Ultra-Cast, Inc., Civ. A. No. 03-6863, 2004 WL 1622034, at *1-2, *4 (E.D. Pa. July 20, 2004) (finding that purchase orders that provided that by "commencement of performance, or any other actions by Seller acknowledging this Purchase Order, Seller hereby accepts and agrees that the contract of sale of products/services is expressly limited to the terms specifically set forth, or incorporated by reference, in this Purchase Order" was

8

purchase order, which the MoA also requires to create a legally binding obligation. Rather, the only purchase order that was executed was the one attached to the MoA, which simply cannot be characterized as "separate" under the terms of the NBO clause.[5]

We conclude that the parties have not expressed an intent to be bound and thus, there is no enforceable written contract. Okna contends that the execution of the Purchase Order sufficed to create obligations under the MoA, but this Purchase Order was explicitly contemplated by the MoA. (See MoA ¶ 3.) If, in fact, the attached Purchase Order satisfied the MoA's requirements for the creation of a binding agreement, then the NBO clause would be almost meaningless because it would have lost effect immediately upon the attachment of the Purchase Order, which the MoA required, to the signed MoA. Moreover, because the language of the NBO clause envisions separate written agreements, which would necessarily entail further negotiations, we can only conclude that the parties did not intend to be bound by the MoA immediately upon its execution. Quandry Sols. Inc., 2009 WL 997041, at *12 ("[C]ontemplation of future negotiations prior to the execution of a formal contract is strong evidence that the parties did not intend to be bound by any preliminary agreement."). Additionally, Okna's and Diversified's agreement in the MoA to execute non-disclosure agreements (MoA ¶ 5) further suggests that the MoA was

---

a valid contract where seller signed acknowledgement copies of the purchase orders and began performance under the purchase orders); Rajat Wires Private Ltd. v. Am. Steel Indus., Inc., Civ. A. No. 12-1997, 2013 WL 5738867, at *2-3 (E.D. Pa. Oct. 21, 2013) (finding purchase orders to constitute binding contracts where they set forth the place of shipment, the amounts ordered, and the price and the buyer accepted the product). However, the Purchase Order in the instant case did not set forth specific terms that were accepted and strictly adhered to. Indeed, neither Okna nor Diversified could have performed under the terms of the Purchase Order because the Purchase Order does not specify an actual product that Diversified was to produce and deliver. Under these circumstances, the Purchase Order cannot qualify as the requisite "separate agreement[] and purchase order[] with associated terms and conditions" to which the NBO clause refers.

[5] Plaintiff's counsel claimed at oral argument that the Purchase Order was not attached (Hr'g Tr. at 15:24-16:11), but the record evidence demonstrates that it was attached to the MoA (Ostaniewicz Dep. at 63:20-64:1).

non-binding because parties "often" execute non-disclosure agreements in non-binding memoranda in order to learn more about their counterparty before committing themselves to a binding agreement. See, e.g., CKSJB Holdings, LLC, 379 F. Supp. 3d at 397.

Okna urges us to construe any ambiguities in the NBO clause against Diversified, the drafter of the MoA, and to conclude that the MoA is binding. See Kiewit E. Co. v. L & R Const. Co., 44 F.3d 1194, 1202-03 (3d Cir. 1995) (stating that an ambiguous contract must be construed against the party that drafted it). However, we do not find the MoA to be ambiguous and therefore confine our analysis to the parties' intent evinced in the plain language of the MoA and the course of their performance. See Norfolk S. Ry. Co., 870 F.3d at 253. Okna also argues that because the parties referred to the MoA as "an earlier agreement," the parties understood that the MoA was an enforceable contract. (Ex. 12 to Pl.'s Ex. A; Klawonn Dep. at 62:17-20.) However, not all agreements are binding and enforceable, such as agreements to agree or agreements without consideration. See, e.g., Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002) (stating that "[w]ithout consideration, a contract is unenforceable" (quoting Channel Home Centers, Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986))); Harmon v. Thomas, No. 1958 EDA 2018, 2019 WL 1968231, at *2-3 (Pa. Super. Ct. May 1, 2019) (finding agreement to make indeterminate contributions to child's college tuition fund to be an "agreement to agree" and therefore unenforceable). Okna additionally argues that Diversified relied on the MoA and Purchase Order in order to obtain funding from its Japanese parent. But the mere fact that Diversified told its parent about the MoA and Purchase Order in order to obtain funding does not support a conclusion that Diversified intended to enter into a binding contract or that the Japanese parent only provided funding because it thought that the MoA was binding.

Consequently, we conclude that the MoA is not an enforceable contract and therefore grant Diversified's Motion for Summary Judgment as to Count One and deny Okna's Motion for Partial Summary Judgment as to Count One.

### B. Count II: Breach of Implied Contract

In Count II of the Complaint, Okna asserts, in the alternative to its claim in Count I, that the parties' course of dealings over nearly two years resulted in an implied contract that Diversified breached by withdrawing its support for the Series 3500 project. Diversified counters that Okna cannot maintain a claim for breach of implied contract when there is an express contract, and it adds that even if Okna could, there is no evidence of actions or a course of dealing that would support a conclusion that the parties entered into an implied contract.[6]

"The distinction between express and implied contracts rests on alternative methods of contract formation. Contracts are 'express' when the parties state their terms and 'implied' when the parties do not state their terms." Baer v. Chase, 392 F.3d 609, 616 (3d Cir. 2004). "'An implied-in-fact contract is a true contract arising from mutual agreement and intent to promise, but where the agreement and promise have not been verbally expressed. The agreement is inferred from the conduct of the parties.'" Aspen Specialty Ins. Co. v. Hosp. Supportive Sys., LLC, Civ. A. No. 16-1133, 2018 WL 3970434, at *6 (E.D. Pa. Aug. 20, 2018) (quoting Matter of Penn Cent. Transp. Co., 831 F.2d 1221, 1228 (3d Cir. 1987)). "'The essential elements of breach of implied

---

[6] Counsel for Diversified suggested at oral argument that Okna could not pursue an implied contract claim because the MoA was a legally enforceable agreement that would preclude the existence of an implied contract. Specifically, he argued that "the parties agreed that at that date and time we don't have [an] enforceable agreement for the sale or purchase of any product." (H'rg Tr. at 31:5-7.) We have great difficulty reconciling this argument with Diversified's argument in its briefs that the MoA created no binding obligations. Moreover, we agree with Diversified that the MoA was a non-binding agreement. Accordingly, we will not reject Okna's implied contract claim based on a conclusion that there was an express contract that governed the parties' relationship.

11

contract are the same as an express contract, except the contract is implied through the parties' conduct, rather than expressly written.'" ATG Tr. Co. v. Schlichtmann, 314 F. Supp. 3d 718, 725 (E.D. Pa. 2018) (quoting Enslin v. The Coca–Cola Co., 136 F. Supp. 3d 654, 675 (E.D. Pa. 2015)). "Although an agreement need not contain all of the terms necessary for the execution of the agreement, it must 'represent a meeting of the parties' minds on the essential terms of their agreement.'" Quandry Sols. Inc., 2009 WL 997041, at *12 (quoting Yellow Run Coal Co. v. Alma–Elly–Yv Mines, Ltd., 426 A.2d 1152, 1154–55 (Pa. Super. Ct. 1981)). "The essential terms of a contract . . . include the time and manner of performance and price or other consideration." Id. (citations omitted).

Okna's implied contract claim, like the express contract claim, suffers from several infirmities. First, there is no record evidence that shows that the parties intended to be bound by the alleged implied agreement. The parties do not have an extensive course of dealing that would suggest an implied contract or an intent to be bound. See, e.g., Domico v. Downey, Civ. A. No. 06-2474, 2007 WL 2108243, at *3 (E.D. Pa. July 19, 2007) (finding an implied contract where broker continued procuring potential buyers for seller's restaurant past the expiration date of the written listing agreement); Liss & Marion, P.C. v. Recordex Acquisition Corp., 983 A.2d 652, 659 (Pa. 2009) (concluding that the record evidence supported the existence of an implied service contract where plaintiffs' firms routinely requested and paid for medical records and medical record copying service routinely copied and sent medical records to the plaintiffs' firms). There is no record evidence of the purchase or sale of specific items or the delivery of any goods.[7] Okna recounts that it and Diversified worked together in designing the 3500 series window. (Pl.'s

---

[7] Okna argues that Diversified has customers in the industry—not that Okna has purchased goods from Diversified—but it is unclear how this, alone or in conjunction with the other evidence adduced, would be suggestive of an implied agreement. (Pl.'s Resp. at 5.)

12

Resp. at 5; see, e.g., Pl.'s Exs. 1-3.) However, without an established course of dealing between the parties, cooperation alone does not support a conclusion that the parties intended to be bound. We acknowledge that the record shows that the parties did perform some of the tasks laid out in the non-binding MoA, such as the execution of the non-specific Purchase Order and Okna's contribution of $80,000 for tooling. (Klawonn Dep. at 91:1-5; Ostaniewicz Dep. at 63:20-64:1.) However, Plaintiff cites to no case law in support of the proposition that voluntary performance of some of the terms of an explicitly non-binding agreement can give rise to an inference of an intent to be bound and a binding contract, and we find none in support of this proposition. Indeed, precedent outside of this jurisdiction suggests the contrary. See Pharmathene, Inc. v. Siga Techs., Inc., Civ. A. No. 2627, 2008 WL 151855, at *9 n.34 (Del. Ch. Jan. 16, 2008) (questioning whether partial performance of terms in non-binding term sheet alone could override the express language expressing an intent not to be bound).

We conclude that the parties' conduct does not demonstrate an intent to be bound by an implied contract, and we further conclude that there is no meaningful course of dealing from which we could deduce an implied contract. We therefore grant Diversified's Motion for Summary Judgment as to Count II of the Complaint.

### C. Count III: Breach of Requirements Contract

In Count III of the Complaint, Okna alleges that Diversified breached a requirements contract pursuant to which Diversified was to produce pultrusions to supply all of Okna's requirements. Okna seeks summary judgment on this Count but does not present any argument or evidence in support of that request. Diversified also moves for summary judgment on this Count, arguing, inter alia, that there is no record evidence that the parties agreed that Diversified would supply all of Okna's requirements.

"While the quantity term in requirements contracts need not be numerically stated, there must be some writing which indicates that the quantity to be delivered under the contract is a party's requirements or output." E. Dental Corp. v. Isaac Masel Co., 502 F. Supp. 1354, 1364 (E.D. Pa. 1980) (citation omitted); see also URL Pharma, Inc. v. Reckitt Benckiser, Inc., Civ. A. No. 15-505, 2015 WL 5042911, at *14 (E.D. Pa. Aug. 25, 2015) (citing E. Dental Corp., 502 F. Supp. at 1364). "Generally, the buyer under a requirements contract agrees to purchase all of its requirements for a particular good 'as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate . . . may be . . . demanded.'" Reilly Foam Corp. v. Rubbermaid Corp., 206 F. Supp. 2d 643, 657 (E.D. Pa. 2002) (alterations in original) (quoting 13 Pa. Cons. Stat. Ann. § 2306(a)); Int'l Cartridge Corp. v. Kilgore Flares Co., No. 441 WDA 2012, 2014 WL 10965434, at *10 (Pa. Super. Ct. Mar. 4, 2014) (affirming conclusion that no requirements contract existed where seller did not state that it would satisfy all of buyer's demand or that it would provide buyer with all goods it produced). Here, nothing in the record suggests that Diversified agreed to supply Okna with all of the components that Okna required. We therefore conclude that no requirements contract exists, deny Okna's Motion on this Count, and grant Diversified's Motion on this Count.

**D. Count IV: Promissory Estoppel**

In connection with Count IV of the Complaint, Okna alleges that Diversified made representations concerning the parties' joint project on which Okna relied and asserts that it would be inequitable for Diversified's promises to go unenforced. Diversified moves for summary judgment on this Count, arguing, among other things, that it made no promise that was explicit or certain enough to support a promissory estoppel claim and that many of the actions that Okna

allegedly took in reliance on Diversified's promises occurred before the two parties even began seriously discussing working together.

Promissory estoppel is a doctrine that "makes otherwise unenforceable agreements binding." Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000). To establish promissory estoppel under Pennsylvania law, the plaintiff must prove that "1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." Edwards v. Wyatt, 335 F.3d 261, 277 (3d Cir. 2003) (quoting Crouse, 745 A.2d at 610). "There must be an express promise between the promisor and the promisee; a 'broad or vague implied promise' will be deemed insufficient." MRO Corp. v. Humana Inc., Civ. A. No. 16-2881, 2019 WL 2389507, at *3 (E.D. Pa. June 5, 2019) (citations omitted). "Moreover, in order to qualify as an express promise, '[t]he promise must be certain and explicit enough so that the full intention of the parties may be ascertained to a reasonable certainty.'" KSM Assocs., Inc. v. ACS State Healthcare, LLC, Civ. A. No. 05-4118, 2006 WL 1308267, at *2 (E.D. Pa. May 10, 2006) (alteration in original) (quoting Ankerstjerne v. Schlumberger Ltd., Civ. A. No. 03-3607, 2004 WL 1068806, at *5 (E.D. Pa. May 12, 2004)). "'A party asserting a claim of [promissory] estoppel has the burden of establishing all the essential elements.'" Ndubizu v. Drexel Univ., 768 F. Supp. 2d 796, 801 (E.D. Pa. 2011) (quoting Thatcher's Drug Store of W. Goshen, Inc. v. Consol. Supermarkets, Inc., 636 A.2d 156, 160 (Pa. 1994)).

Plaintiff cites no evidence of an express promise, and we find no express promise by Diversified in the record that is definite and certain enough for Okna to rely upon. The parties

generally expressed a desire to enter into a business relationship,[8] but this expressed desire, without more, is insufficient to support a claim of promissory estoppel. See Burton Imaging Grp. v. Toys "R" Us, Inc., 502 F. Supp. 2d 434, 439 (E.D. Pa. 2007) (finding that defendant's statement that it was "'going to move ahead' is simply insufficient to qualify as a promise for a claim of detrimental reliance because it does not express the intent of the parties with reasonable certainty" and because it "fails to indicate key terms such as payment . . . or duration"); Bull Int'l, Inc. v. MTD Consumer Grp., Inc., 654 F. App'x 80, 100–01 (3d Cir. 2016) (affirming dismissal of promissory estoppel claim based on implied promise to indefinitely do business together); Wasseff v. Nat'l Inst. of Health, Civ. A. No. 16-703, 2017 WL 495795, at *8 (E.D. Pa. Feb. 6, 2017) (finding no express promise to further student's career development in either faculty's statement to student that he would receive internships and training or in university mission statement, which stated it would provide an environment that "promotes learning, productive employment, and safe experiences for all members of the University community"). We conclude that the record contains no evidence of a promise that is explicit or certain enough to support a claim of promissory estoppel, and therefore no reasonable jury could find in favor of Okna on Count IV. We therefore grant Diversified's Motion for Summary Judgment as to Count IV.

---

[8] "Diversified Structural Composites and Okna wish to enter into a business relationship for the supply of fenestration materials branded as Diversified Lineal Systems (DLS)." (Preamble to the MoA.)

## IV. CONCLUSION

For the foregoing reasons, we deny Plaintiff's Motion for Partial Summary Judgment, grant Defendant's Motion for Summary Judgment, and enter judgment in favor of Defendant on all Counts of the Complaint. An appropriate Order follows.

BY THE COURT:


/s/ John R. Padova

John R. Padova, J.